1
2
3
4
5
6
7
8                            **UNITED STATES DISTRICT COURT**

9                           **EASTERN DISTRICT OF CALIFORNIA**

10

11   ANTHONY IRELAND,                    )   Case No.: 1:11-cv-02116-AWI-JLT
                                          )
12                  Petitioner,           )   FINDINGS AND RECOMMENDATIONS TO
                                          )   DENY PETITION FOR WRIT OF HABEAS
13          v.                            )   CORPUS (Doc. 1)
                                          )
14   BRENDA CASH, Warden,                 )   ORDER DIRECTING THAT OBJECTIONS BE
                                          )   FILED WITHIN TWENTY-ONE DAYS
15                  Respondent.           )
                                          )
16   _____

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.

19                              **PROCEDURAL HISTORY**

20          Petitioner is in custody of the California Department of Corrections and Rehabilitation serving

21   an indeterminate sentence of 100 years-to-life (i.e., four consecutive 25-years-to-life sentences). This

22   sentence was imposed by the Fresno County Superior Court of California after a jury convicted him in

23   2009 on four counts of forcible rape. (Doc. 15, Ex. A ("Ex. A"), p. 2). The jury also found that

24   Petitioner had used a deadly weapon in the commission of each offense and that he committed these

25   crimes against multiple victims. (Id.).

26          Petitioner filed a direct appeal in the California Court of Appeals, Fifth Appellate District (the

27   "5th DCA"), which, in a partially published decision, affirmed Petitioner's conviction on September 8,

28

                                              1

2010.  (Ex. A).   On October 18, 2010, Petitioner filed a petition for review in the California Supreme Court that was summarily denied on December 21, 2010.  (Doc. 16, Lodged Document ("LD") 5).

On December 21, 2011, Petitioner filed the instant petition.  (Doc. 1). Respondent's answer was filed on March 5, 2012.   (Doc. 15).  On July 25, 2012, Petitioner filed his Traverse.  (Doc. 30). Respondent concedes that the all grounds for relief in the petition have been fully exhausted.  (Doc. 15, p. 8).

## FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's partially published decision[1]:

**Count 1: V.B.**
In late October of 2007, V.B. was working as a prostitute on Motel Drive when appellant, in a four-door burgundy car, approached and asked her for a "date," which she described as an agreement to have sex for an agreed-upon amount of money. The two agreed on a price of $40. V.B. suggested they go to her motel room but appellant declined, saying he had once been robbed in a motel room. He suggested they drive down the street and park, and V.B. agreed. They parked in a driveway near railroad tracks.

Appellant told V.B. to get into the back seat of the car, which she did. When appellant entered the back seat, V.B. felt a metal knife against her neck. V.B. began to cry and begged appellant "please don't hurt me." V.B. testified she was afraid and did not want to die. Appellant told her to be quiet and that he would not hurt her if she cooperated. V.B. was afraid that, if she resisted, appellant would cut or stab her.

Appellant then had vaginal intercourse with V.B., while holding the knife to her throat. V.B. described the knife as a big butcher knife with a seven- to nine-inch blade and a wooden handle. Appellant told her to make noises like she enjoyed the sex act, but instead she cried "loudly" the entire time. After appellant ejaculated, he exited the car and threw the condom he was wearing into the bushes. When V.B. asked if she could leave, appellant said yes. V.B. then exited the car and ran. Appellant did not pay her.

V.B. had never met appellant prior to the incident. She did not consent to the sexual act as it happened, and she did not agree to the use of the knife when she got into the car. V.B. did not report the incident to the police at first, because she was a prostitute.

**Count 2: J.W.**

In late September or early October of 2007, J.W. was working as a prostitute when appellant, in a four-door burgundy car, pulled up next to her and asked for a "date." J.W. was tired and ready to go home, so she quoted him a $100 price, thinking he would not agree to it. But appellant agreed to the price, and J.W. got into the car. J.W. told appellant she had a motel room, but he said he had a bad experience in a motel room, and they instead drove to a location five minutes away and parked.

---

[1] The 5th DCA's summary of the facts in its partially published opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Thus, the Court adopts the factual recitations set forth by the 5th DCA.

2

The two agreed to have sex in the car, so J.W. climbed into the back seat. Appellant got out of the driver's seat and walked to the back. When he opened the back door, J.W. asked him for her money. Appellant said, "oh, oh, yeah," reached toward the waist of his pants, and pulled out a large knife with a 10–inch blade.

Appellant got into the back seat and on top of J.W. and held the knife to the side of her neck. When J.W. asked appellant what he was doing, he told her to "shut up." J.W. felt that appellant had an erection and asked him to put on a condom. He told her to put it on him. J.W. was afraid appellant might "slice [her] neck off." She asked appellant not to hurt her. She cooperated because she was fearful she might die.

Appellant held the knife to J.W.'s throat the entire time. She was very frightened and asked appellant to remove the knife from her neck. But appellant said "no" because "'you might scream.'" He told her not to scream or make any sudden movements or he would use the knife. J.W. did not scream, because she was afraid appellant might stab her in the neck.

Appellant had sex with her. After he ejaculated, he got out of the car and threw the condom on the ground. He did not pay her. J.W. never agreed to have sexual intercourse with appellant while he held a knife to her throat.

J.W. did not report the incident to the police, but she did tell others on the street about the incident. After the incident, she saw appellant in his car at a liquor store. She yelled at him to leave and told other women in the area, "that's him, don't get in his car."

J.W. was later contacted by the police and asked if she knew anyone bothering the women in the area. She related to them what had happened to her.

**Count 3: A.H.**

In October of 2007, A.H. was working as a prostitute when appellant, in a red four-door car, pulled up and asked her for a "date." They agreed on $60. A.H. got into appellant's car and they drove to a cemetery and parked.

Once there, they both got out of the car and A.H. got into the back seat. A.H. told appellant she needed her money. He told her she would get it but, when he got into the back seat, he put a big kitchen knife to her throat. A.H. said "no," but appellant held the knife to A.H.'s throat, told her to put a condom on him, and then told her to remove her pants and get on her knees. She complied because she was afraid he was going to kill her. She didn't say anything else because she was too afraid. Appellant then had vaginal intercourse with her, after which she got out of the car and left. Appellant did not pay her.

A.H. had never met appellant before the incident and did not agree to the use of the knife. She did not report the incident because she had been "hurt" when she was younger and the police had done nothing about it. Here, she was later contacted by police and told them what had happened.

**Count 4: C.S.**

In November of 2007, C.S. (sometimes known as Baby), who was 15 years old at the time, was working as a prostitute when appellant, in a four-door burgundy car, asked her for a "car date." They agreed on $80. C.S. suggested they go to a hotel, but appellant suggested they drive to a cemetery, and C.S. agreed.

Once there, C.S. got out of the car, got into the back seat, and asked appellant for her money.

Appellant acted as if he were going to get the money from his pocket but, instead, pulled out a large knife with an eight– or 10–inch blade from the front of his pants. Appellant put the blade to C.S.'s neck and said, "do what I say and you won't get hurt." She was "shocked" and "scared" that she might die. She requested that he use a condom, and appellant complied. Appellant then had vaginal intercourse with her. He held the knife to her throat the entire time. C.S. did not agree to the use of the knife, but she thought appellant would cut her if she did not comply. After the incident, C.S. asked appellant for a ride back and he agreed. Appellant did not pay her.

About a week later, C.S. was on the street when she was contacted by police because it was late and she looked young. One of the officers mentioned there had been rapes in the area. C.S. described what had happened to her and gave the officer a description of appellant, his vehicle, and the assault.

**Police Investigation**

In November of 2007, Detective Neal Cooney, a sexual assault investigator, received information from another officer informing him of sexual assaults on female prostitutes. The description of the assailant, his vehicle, and his modus operandi were similar.

On November 6, 2007, while conducting surveillance, Detective Cooney struck-up a conversation with J.W., who was walking the street. She explained she had been raped at knifepoint a few weeks earlier. Her description of the suspect was similar to that already received.

Later that evening, Detective Cooney observed a vehicle that fit the suspect's vehicle description. Detective Cooney initiated a traffic stop. Appellant was the only occupant of the vehicle. Appellant consented to a search, but told Detective Cooney that he had a knife on his right side. Cooney removed the knife from appellant's waistband and arrested appellant.

V.B., J.W., and A.H. subsequently identified appellant in a photographic lineup as the man who raped them.

Detective Cooney and another officer interviewed appellant at the police station. The interview, which was recorded, was subsequently played for the jury during trial. Appellant told the officers he carried a butcher knife for protection. He also said he had had sex with three or four prostitutes, whom he subsequently described as one blonde, one Asian, and two Black females.

Appellant initially claimed all of the women consented to sex and that he used the knife with one, the blonde, because it turned her on. He denied putting it to her neck to hurt her but said he rubbed it on her body.

After further questioning, appellant admitted he used the knife on "Baby." Appellant told her he was going to use the knife, but she did not want him to do so. He then told her, "well I'm going to do it I was just like let me do it." After he promised he wouldn't kill her, she agreed. He claimed to put the knife to her breasts and her lower neck area.

Appellant then admitted he also used the knife on one of the Black women but said he quit when she became scared. When she said she did not want to do "it," he told her, "you already said you were going to do it...." After they had sex, she jumped out of the car without taking any money.

Appellant then said he had had sex with another "black girl." He initially gave her money for

4

sex. About half way through the sexual act, appellant pulled out a knife. After they had sex, he took the money back from her.

Appellant stated that he also picked up a Hispanic woman and, while she was getting undressed, he pulled out the knife. When he asked her if he could use it, she told him to get off her and not to hurt her. She then jumped out of the car and ran.

Appellant also admitted he picked up a "white girl" a few days before Halloween and "use[d] a knife" on her.

When police asked appellant if he had any money on him when he picked up the women, he stated that he might not have had "the exact amount" and went on to add that he was afraid to tell the women because

> "... one she was just like, like what the f... are you doing ... and I was just like you know whatever the case is like you know I knew that she, she was like was basically like thinking in her head like okay he is going to hurt me or something like that...."

Appellant expressed remorse for putting the victims in fear and agreed to write a letter of apology to them. The letter, which was read to the jury, stated that appellant wanted to accept responsibility for what he had done. He claimed he did not intend to hurt any of the victims but acknowledged that he might have done so. He stated that he could not change what had happened in the past, but he could make better decisions in the future. He stated, "Maybe it was because I got caught. Either way, I know that's what was best."

**Evidence Code Section 1108**

Pursuant to Evidence Code section 1108, the prosecution was permitted to introduce evidence of a prior uncharged incident committed by appellant. A woman, S.M., testified that, in September of 2007, she was taking a shower at home in Clovis. When she got out of the shower, she heard a noise outside and thought someone was touching the bars on the window. She saw a person wearing a hat, glasses, and black clothing, looking into the window. She called the police.

The officer who responded to the scene dusted the window and bars for fingerprints. He also located shoe prints in the dirt below the windows.

Appellant was found in the front yard of S.M.'s house. His shoes matched the imprint found by the windows. A fingerprint matched his left thumb. Appellant initially stated he was looking for a friend but later admitted looking into the window and seeing S.M.'s exposed breasts.

(Ex. A, pp. 2-8).

## DISCUSSION

I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n.

5

7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States

Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is

located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v.

Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other*

*grounds by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after

statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore

governed by its provisions.

II.      Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he

can show that the state court's adjudication of his claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of,
> clearly established Federal law, as determined by the Supreme Court of the United States;
> or
> (2)  resulted in a decision that "was based on an unreasonable determination of
> the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529 U.S. at

412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that

contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts

that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."

Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. 326, 405-406 (2000).

A state court decision involves an "unreasonable application" of clearly established federal law "if the

state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable

manner."  Id., quoting Williams, 529 U.S. at 409-410; Woodford v. Visciotti, 537 U.S. 19, 24-25

(2002)(*per curiam*).

Consequently, a federal court may not grant habeas relief simply because the state court's

decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable.

Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409).  In

Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an

"unreasonable application" of federal law is an objective test that turns on "whether it is possible that

fairminded jurists could disagree" that the state court decision meets the standards set forth in the

AEDPA.  If fairminded jurists could so disagree, habeas relief is precluded.  Richter, 131 S.Ct. at 786.

As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an

unreasonable application of, clearly established Federal law" is "difficult to meet," because the

purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme

malfunctions in the state criminal justice systems,'" and not as a means of error correction.  Richter,

131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332, 99 S.Ct. 2781, n. 5 (1979)(Stevens,

J., concurring in judgment).  The Supreme Court has "said time and again that 'an *unreasonable*

application of federal law is different from an *incorrect* application of federal law.'" Cullen v.

Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus

from a federal court "must show that the state court's ruling on the claim being presented in federal

court was so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility of fairminded disagreement."  Richter, 131 S.Ct. at 787-788. Put

another way, a state court's determination that a claim lacks merit bars federal habeas relief so long as

"fairminded jurists could disagree" on the state court's decision.  Yarborough v. Alvarado, 541 U.S.

652, 664 (2004).

Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state

court that adjudicated the claim on the merits."   Cullen, 131 S.Ct. at 1398 ("This backward-looking

language requires an examination of the state-court decision at the time it was made.  It follows that

the record under review is limited to the record in existence at the same time–i.e., the record before the

state court.")

The second prong of federal habeas review involves the "unreasonable determination" clause

of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings.

7

1   *Davis v. Woodford*, 384 F.3d at 637, citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003).  Under

2   § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's

3   claims "resulted in a decision that was based on an unreasonable determination of the facts in light of

4   the evidence presented in the State court proceeding."  *Wiggins v. Smith*, 539 U.S. at 520;  *Jeffries v.*

5   *Wood*, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible,

6   thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").  A

7   state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be

8   debatable among reasonable jurists."  *Id.* ; see *Taylor v. Maddox*, 366 F.3d 992, 999-1001 (9th Cir.

9   2004), cert.denied, *Maddox v. Taylor*, 543 U.S. 1038 (2004).

10         The AEDPA also requires that considerable deference be given to a state court's factual

11   findings.   "Factual determinations by state courts are presumed correct absent clear and convincing

12   evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and

13   based on a factual determination will not be overturned on factual grounds unless objectively

14   unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."  *Miller-*

15   *El v. Cockrell*, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of

16   historical or pure fact, not mixed questions of fact and law.  See *Lambert v. Blodgett*, 393 F.3d 943,

17   976-077 (2004).

18         To determine whether habeas relief is available under § 2254(d),  the federal court looks to the

19   last reasoned state court decision as the basis of the state court's decision.  See *Ylst v. Nunnemaker*,

20   501 U.S. 979, 803 (1991);  *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

21   court decided the petitioner's claims on the merits but provided no reasoning for its decision, the

22   federal habeas court conducts "an independent review of the record...to determine whether the state

23   court [was objectively unreasonable] in its application of controlling federal law."  *Delgado v. Lewis*,

24   223 F.3d 976, 982 (9th Cir. 2002); see *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

25   "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."

26   *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's

27   claims on procedural grounds or did not decide such claims on the merits, the deferential standard of

28

8

1   the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v.

2   Morgan, 313 F.3d at 1167.

3        The prejudicial impact of any constitutional error is assessed by asking whether the error had

4   "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

5   Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding

6   that the Brecht standard applies whether or not the state court recognized the error and reviewed it for

7   harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate

8   prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S.

9   648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA alleges ineffective

10   assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice

11   standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila

12   v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002);  Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir.

13   2009).

14   **III.  Review of Petitioner's Claims.**

15        The instant petition itself alleges the following as grounds for relief: (1) insufficient evidence

16   to support the four forcible rape convictions; (2) error in instructing the jury with CALCRIM 1000 and

17   250, and failure to instruct on the lesser included offense of assault and battery; (3) error in admitting

18   evidence of an uncharged crime; and (4) ineffective assistance of trial counsel.

19      A.  Sufficiency of the Evidence

20        Petitioner first contends that insufficient evidence was presented at trial to support the four

21   forcible rape convictions.  This contention is without merit.

22       1.  The 5th DCA's Opinion.

23   The 5th DCA rejected Petitioner's claim as follows:

24       Appellant argues there is insufficient evidence to convict him of any of the forcible rapes. He
       specifically contends that each woman consented to engage in sex acts in return for money and,
25       although each woman objected to the use of the knife, the use of that knife did not
       automatically terminate the consent. He claims there was insufficient evidence to establish that
26       each woman withdrew her consent and communicated that withdrawal of consent to appellant.
       We disagree.

27       In determining whether the evidence is sufficient to support the verdict, we review the entire

28

record, viewing the evidence in the light most favorable to the judgment and presuming in support of the verdict the existence of every fact the jury could reasonably deduce from the evidence. The issue is whether the record so viewed discloses evidence that is reasonable, credible and of solid value such that a rational trier of fact could find the elements of the crime beyond a reasonable doubt. (People v. Carter (2005) 36 Cal.4th 1114, 1156, 32 Cal.Rptr.3d 759, 117 P.3d 476.)

Appellant was convicted of four counts of forcible rape within the meaning of section 261, subdivision (a)(2), which defines rape as an act of sexual intercourse "[w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."

Lack of consent is an element of the crime of rape. Consent is defined in section 261.6 as "positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." CALCRIM No. 1000, as given here, instructed that "[t]o consent, a woman must act freely and voluntarily and know the nature of the act."

"Actual consent must be distinguished from submission. [A] victim's decision to submit to an attacker's sexual demands out of fear of bodily injury is not consent [citations] because the decision is not freely and voluntarily made (§ 261.6). A selection by the victim of the lesser of two evils—rape versus the violence threatened by the attacker if the victim resists—is hardly an exercise of free will. [Citation.]" (People v. Giardino (2000) 82 Cal.App.4th 454, 460, fn. 3, 98 Cal.Rptr.2d 315.)

Where the woman's lack of consent was uncommunicated and could not reasonably be detected, however, the accused may not be guilty of rape. It is a defense that the accused reasonably and in good faith believed the woman engaged in the act consensually. (People v. Mayberry (1975) 15 Cal.3d 143, 153–158, 125 Cal.Rptr. 745, 542 P.2d 1337.)

Here the jury was instructed: "Evidence that the woman requested [appellant] to use a condom or other birth control device is not enough by itself to constitute consent." (See CALCRIM No. 1000.) And: "[Appellant's] is not guilty of rape if he actually and reasonably believed that the woman consented to intercourse. The People have the burden of proving beyond a reasonable doubt that [appellant] did not actually and reasonably believe that the woman consented." (See ibid.)

Withdrawal of consent can occur at any time. (In re John Z. (2003) 29 Cal.4th 756, 762, 128 Cal.Rptr.2d 783, 60 P.3d 183.) Here the trial court gave the standard instruction on withdrawal of consent:

> "A woman who initially consents to an act of intercourse may change her mind during the act. If she does so, under the law, the act of intercourse is then committed without her consent if: [¶] One, she communicated to [appellant] that she objected to the act of intercourse and attempted to stop the act; [¶] Two, she communicated her objection through words or acts that a reasonable person would have understood as showing her lack of consent; [¶] and Three, [appellant] forcibly continued the act of intercourse despite her objection." (See CALCRIM No. 1000.)

Appellant's argument is that each victim gave her consent to the sex act that was committed, that his use of the knife during the act did not automatically negate that consent, and that there was insufficient evidence that any of the victims communicated a withdrawal of consent to him. Respondent, on the other hand, contends the determinative question is not whether the victims communicated a withdrawal of consent. Instead, according to respondent, appellant's

10

use of the knife, along with his express or implied threat to harm his victims if they did not cooperate, did automatically negate their previously given consent.

We agree with respondent's analysis. There is no doubt that, at the beginning of each encounter, each victim freely consented to intercourse. But as to each of the victims, appellant communicated the express or implied threat that, if they did not continue to cooperate even after he produced the knife and held it to their throats, he would do them harm. As to the victim V.B., the testimony was that appellant told her "just to cooperate" and she "won't get hurt." When the victim J.W. asked appellant what he was doing with the knife, he told her to "'shut up.'" She did, because she was afraid he would otherwise "slice [her] neck off." He told her not to scream or make any sudden movements and he would not use the knife. When the victim A.H. reacted to appellant putting the knife to her throat by saying "no," appellant responded by instructing her to put a condom on his penis, remove her pants, and get on her knees. She complied because she thought he would otherwise kill her. To the victim C.S., appellant said "do what I say and you won't get hurt." She cooperated out of fear.

It is not appellant's position that there is insufficient evidence to show a lack of consent, from each of the victims, after appellant displayed his knife and threatened them. There is more than substantial evidence that each victim's continued participation in the sexual encounter with appellant was in fact nonconsensual after that point.

Instead, appellant's position is that because, as to each victim, consent had once been given, each victim was required not only to withdraw that consent but also to communicate that withdrawal to him—to communicate it, if not expressly, at least by implication. We disagree.

The essence of consent is that it is given out of free will. That is why it can be withdrawn. While there exists a defense to rape based on the defendant's actual and reasonable belief that the victim does consent (People v. Dominguez (2006) 39 Cal.4th 1141, 1148, 47 Cal.Rptr.3d 575, 140 P.3d 866; People v. Mayberry, supra, 15 Cal.3d at pp. 153–158, 125 Cal.Rptr. 745, 542 P.2d 1337), we do not require that victims communicate their lack of consent. (See People v. Maury (2003) 30 Cal.4th 342, 403, 133 Cal.Rptr.2d 561, 68 P.3d 1 [lack of consent need not be proven by direct testimony but may be inferred from use of force or duress].) We certainly do not require that victims resist. (People v. Griffin (2004) 33 Cal.4th 1015, 1024–1025, 16 Cal.Rptr.3d 891, 94 P.3d 1089.) Yet this is what appellant proposes here. At the time of the offenses, appellant told his victims to cooperate or be hurt. Now he contends they were required to express to him their lack of cooperation. That cannot be the law. When appellant used the knife and expressly or impliedly threatened his victims, and in the absence of any conduct by the victims indicating that they continued to consent, the previously given consent no longer existed, either in fact or in law. (Cf. People v. Washington (1962) 203 Cal.App.2d 609, 610, 21 Cal.Rptr. 788 ["[c]onsent induced by fear is no consent at all"].)

Furthermore, even were we to say that these victims were required to communicate their lack of consent to appellant, we would still find substantial evidence to support the convictions. V.B. testified that she never agreed to have sex with appellant with a knife held to her neck. When appellant pressed the knife to her throat, she was afraid and began to cry. She told appellant "please don't hurt me, don't hurt me." J.W. testified that, when appellant put the knife to her neck, she asked him what he was doing and asked him to move the knife. Appellant told her to "shut up" and refused to put the knife down because he thought she might scream. A.H. testified that she said "no" when appellant put the knife to her throat. C.S. testified she was "shocked" and "scared" she might die, and that appellant told her to "do what I say and you won't get hurt." In his confession, appellant stated that C.S. told him she did not want him to use the knife.

From all of this evidence, it is clear that these victims did not continue to consent when

appellant put the knife to their throats and that appellant knew they did not continue to consent. Thus, if they were required to communicate a withdrawal of consent, they adequately did so.

Substantial evidence supports each of the convictions of forcible rape, and we reject appellant's claim to the contrary.

(Ex. A, pp. 8-12).

　　　　　　　　2.  Federal Standard.

　　　　The law on sufficiency of the evidence is clearly established by the United States Supreme Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows:

　　　　"[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

　　　　A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.'"  See id., quoting Jackson, 443 U.S. at 319.  Only where no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted.  See Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

　　　　If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Jackson, 443 U.S. at 326.  A jury's credibility determinations are therefore entitled to near-total deference.  Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, Jackson does not

1    permit a federal court to revisit credibility determinations.  See id. at 957-958.

2            Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

3    conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).  However, mere suspicion and

4    speculation cannot support logical inferences.  Id.; see, e.g., Juan H. v. Allen, 408 F.3d 1262, 1278-

5    1279 (9th Cir. 2005)(only speculation supported conviction for first degree murder under theory of

6    aiding and abetting).

7            After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson

8    with an additional layer of deference.  Juan H., 408 F.3d at 1274.  Generally, a federal habeas court

9    must ask whether the operative state court decision reflected an unreasonable application of Jackson

10   and Winship to the facts of the case.  Id. at 1275.[1]

11           Moreover, in applying the AEDPA's deferential standard of review, this Court must also

12   presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v.

13   Wilson, 477 U.S. 436, 459, 106 S.Ct. 2616 (1986).  This presumption of correctness applies to state

14   appellate determinations of fact as well as those of the state trial courts.  Tinsley v. Borg, 895 F.2d

15   520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to state court

16   determinations of legal questions or mixed questions of law and fact, the facts as found by the state

17   court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455 U.S. 539,

18   597, 102 S.Ct. 1198 (1981).

19           In Cavazos, v. Smith, __U.S. __, 132 S.Ct. 2 (2011), the United States Supreme Court further

20   explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

21           "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions
             should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's
22           verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed
             with the jury. What is more, a federal court may not overturn a state court decision rejecting a
23           sufficiency of the evidence challenge simply because the federal court disagrees with the state
             court. The federal court instead may do so only if the state court decision was "objectively
24           unreasonable." Renico v. Lett, 559 U.S. ——, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678
             (2010) (internal quotation marks omitted).

25

26   _____

27   [1]Prior to Juan H., the Ninth Circuit had expressly left open the question of whether 28 U.S.C. § 2254(d) requires an
     additional degree of deference to a state court's resolution of sufficiency of the evidence claims.  See Chein v. Shumsky,
     373 F.3d 978, 983 (9th Cir. 2004); Garcia v. Carey, 395 F.3d 1099, 1102 (9th Cir. 2005).

28

                                                        13

Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Cavazos, 132 S.Ct. at 3.

"Jackson says that evidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  443 U.S., at 319, 99 S.Ct. 2781.  It also unambiguously instructs that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id., at 326, 99 S.Ct. 2781.

Cavazos, 132 S.Ct. at 6. [2]

     3.  Analysis.

Petitioner does not challenge the fact that he had sexual contact with each of the victims. Rather, he contends that each victim initially consented to engage in sex acts for money and, although he brandished a knife during the course of each sexual episode and each victim objected to the use of the knife, the use of the knife did not, *ipso facto*, terminate the victims' original consent.  In essence, Petitioner argues that insufficient evidence was presented to establish that each victim withdrew her consent and that she communicated that withdrawal of consent to Petitioner.

Cal. Pen. Code § 261, subdivision (a)(2), defines rape as an act of sexual intercourse "[w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."  Lack of consent, which is an element of the crime of rape, is defined as "positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." Cal. Pen. Code § 261.6.  CALCRIM No. 1000, as given here, instructed the jurors that to consent under California law, "a woman must act freely and voluntarily and know the

_____

[2] To the extent that the 5th DCA's opinion does not expressly cite the Jackson v. Virginia standard in analyzing the sufficiency claims herein, it must be noted that, since at least 1980, the California Supreme Court has expressly adopted the federal Jackson standard for sufficiency claims in all state criminal proceedings.  People v. Johnson, 26 Cal.3d 557, 576 (1980).  Accordingly, the state court here applied the correct legal standard, and this Court's only task is to determine whether the state court adjudication was contrary to or an unreasonable application of that standard.

nature of the act."

It was undisputed at trial that Petitioner told each of his victims to cooperate or they would be hurt. He did this while brandishing a knife at their necks, thus implicitly, if not explicitly, threatening death or serious bodily injury if they did not comply with his demands. Under California law, consent induced by fear is no consent at all. People v. Washington, 203 Cal.App.2d 609, 610 (1962). Based upon this state of evidence, the 5th DCA quite reasonably concluded that "[w]hen [Petitioner] used the knife and expressly or impliedly threatened his victims, and in the absence of any conduct by the victims indicating that they continued to consent, the previously given consent no longer existed, either in fact or in law." Under Petitioner's distorted view of the State's law of consent, a woman whom Petitioner has placed in fear of her life by his own threats and actions must risk serious injury or death by affirmatively and verbally indicating to the very person who is threatening her with serious bodily injury or death that she has withdrawn her legal consent to being sexually assaulted. Such an absurd position is neither legally tenable under California law nor rationally tenable in the realm of human nature. Therefore, the 5th DCA's conclusion that sufficient evidence supported each element of the crime of forcible rape was not objectively unreasonable.

B. Instructional Error

Petitioner next contends that the trial court erred in instructing the jury with CALCRIM 1000 and 250, and in failing to instruct the jury on the lesser included offense of assault and battery. This contention is also without merit.

1. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

**CALCRIM No. 1000**
Appellant contends that CALCRIM No. 1000, as given, was deficient on the issue of "withdrawal of consent." Respondent argues, first, that appellant forfeited his right to appellate review by failing to make a request that the trial court modify the instruction and, second, that, even if the instruction as given was error, it was harmless. We agree the failure to make a request to modify the instruction as given generally forfeits the right to appellate review, but we nonetheless examine the issue and find no prejudicial error. (People v. Alvarez (1996) 14 Cal.4th 155, 222, 58 Cal.Rptr.2d 385, 926 P.2d 365; People v. Johnson (1993) 6 Cal.4th 1, 52, 23 Cal.Rptr.2d 593, 859 P.2d 673, abrogated on another point in People v. Rogers (2006) 39 Cal.4th 826, 878–879, 48 Cal.Rptr.3d 1, 141 P.3d 135.)

As noted in part 1, *ante*, the jury was instructed, pursuant to CALCRIM No. 1000, on the issue

15

of consent and withdrawal of consent, as follows:

> "To consent, a woman must act freely and voluntarily and know the nature of the act. [¶] A woman who initially consents to an act of intercourse may change her mind during the act. If she does so, under the law, the act of intercourse is then committed without her consent if: [¶] One, she communicated to [appellant] that she objected to the act of intercourse and attempted to stop the act; [¶] Two, she communicated her objection through words or acts that a reasonable person would have understood as showing her lack of consent; [¶] and Three, [appellant] forcibly continued the act of intercourse despite her objection."

Appellant argues the instruction, as given, incorrectly implied that the "rules governing withdrawal of consent appl[y] only during the act of sexual intercourse," and not before. According to appellant, this instruction erroneously limits the withdrawal of consent requirement to the situation where the woman withdraws her consent during intercourse and the jury would therefore not understand that the requirement that the woman must communicate her withdrawal applied to a "pre-penetration withdrawal of consent as well."

As noted by appellant, in People v. Vela (1985) 172 Cal.App.3d 237, 242, 218 Cal.Rptr. 161, the court held that consent to sexual intercourse could be withdrawn before penetration but not after. In In re John Z., supra, 29 Cal.4th 756, 763, 128 Cal.Rptr.2d 783, 60 P.3d 183, our Supreme Court disagreed with that particular point in Vela and held that a woman could withdraw her consent to sexual intercourse at any time, even during copulation, as long as that withdrawal was clearly communicated. Appellant contends that the instruction, as given here, "preserves the artificial boundary line that was rejected in John Z." and "repeats the same error of Vela, only in reverse." In other words, appellant contends that the instruction limits the rule to a situation where the woman withdraws her consent after penetration and it implies that there is no requirement that a woman communicate withdrawal of consent prior to penetration.

Appellant further contends the instructional error was compounded by the prosecutor's argument that (a) the instruction on withdrawal of consent was inapplicable because "that knife came out prior to any [penetration]" and (b) appellant's display of the knife before penetration automatically rendered the intercourse nonconsensual without any requirement that the women communicate their withdrawal of consent.

We agree with appellant that the instruction on withdrawal of consent could have been confusing. But as we have concluded in part 1, ante, there was no evidence presented that any of the victims here ever consented to having sexual intercourse with a knife held to her throat. It was clear from the words and actions of each of the victims that they did not consent to such an act—that is, they had withdrawn their previously given consent. In the circumstances of this case, no further communication of that withdrawal was required. Thus, appellant's apprehension that the jury interpreted the instruction given as drawing a distinction between pre- and post-penetration withdrawal of consent is immaterial.

And even if the instruction as given was error, it was harmless under any standard. (See Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705; People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243.) Besides instructing that the prosecution must prove the victim did not consent, the trial court also instructed that the prosecution had to prove that appellant "did not actually and reasonably believe that the woman consented." (CALCRIM No. 1000.) We must presume that the jury followed this instruction (People v. Cline (1998) 60 Cal.App.4th 1327, 1336, 71 Cal.Rptr.2d 41), and thus we must conclude that the jury had no reasonable doubt that appellant knew his victims either did not consent or had withdrawn their consent.

16

No prejudicial error occurred.

**CALCRIM No. 250**

Appellant contends that the trial court erred in giving CALCRIM No. 250, which is designed for general intent crimes that do not have a specific mental state element. Appellant argues the trial court should instead have given CALCRIM No. 251, which requires a union and joint operation of act and specific mental state and would have instructed the jury that it had to find that "appellant knew and believed that each prostitute did not consent at the time he engaged in sexual intercourse, and that an after-the-fact realization as to their non-consent would not suffice."

CALCRIM No. 250 (union of act and intent; general intent), as given to the jury stated:

> The crimes charged in this case and the allegations alleged require proof of the union or joint operation of act and wrongful intent. [¶] For you to find a person guilty of the crimes charged in this case, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act. However, it's not required that he or she intend to break the law. The act required is explained in the instruction for that crime or allegation.

On appeal, appellant notes that during his interview with the officers after his arrest, he believed he was being accused of rape for failing to pay the prostitutes after the fact. He told the officers that, when some of the victims failed to request money after sex, he realized they were afraid of him, and he took advantage of that to get out of paying them. Appellant contends that from this misunderstanding, the jury could theorize that appellant's after-the-fact realization that the women were afraid of him and his after-the-fact decision not to pay them operated to invalidate consent to sexual intercourse, which then made the sexual act an act of rape. Appellant contends that this error was compounded by the prosecutor's argument in closing that "[i]t doesn't matter what [appellant] intended in his mind."

Appellant argues that, because the jury was never instructed that failure to pay a prostitute does not amount to rape, CALCRIM No. 251, rather than CALCRIM No. 250, was the appropriate instruction to give. CALCRIM No. 251 states:

> The crime[s] [(and/or) other allegations[s]] charged in this case require proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the crime[s] (in this case/of _____(insert name of alleged offense and count) [or to find the allegation[s] of _____(insert name of enhancement true), that person must not only intentionally commit the prohibited act [or intentionally fail to do the required act], but must do so with a specific (intent/[and/or]mental state). The act and the specific (intent/[and/or]mental state) required are explained in the instruction for that crime [or allegation]. [¶]…[¶][The specific (intent/[and/or]mental state) required for the crime of _____(insert name of alleged offense) is ___(insert specific intent).]

A trial court must instruct the jury on the law applicable to a particular case, i.e., the general principles of law relevant to issues raised by the evidence. (People v. Martin (2000) 78 Cal.App.4[th] 1107, 1111.) When an appellant claims a trial court failed to properly instruct on applicable legal principles, the appellate court ascertains the relevant law and then determines the meaning of the instructions given. (Ibid.) The proper test is whether the trial court fully and fairly instructed the jury on the applicable law. To determine whether error has occurred, we must consider the instruction as a whole and assume the jurors are intelligent persons capable of understanding and correlating all the instruction that have been given. (Id. at p.

17

1112.)  "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonable susceptible to such interpretation."  (<u>Ibid.</u>)

There are two types of criminal intent: general intent and specific intent.  In <u>People v. Hood</u> (1969) 1 Cal.3d 444, 456-457, the Supreme Court explained the difference between the two:

> When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act.  This intention is deemed to be a general criminal intent.  When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemd to be one of specific intent.

"General criminal intent thus requires no further mental state beyond willing commission of the act proscribed by law." (<u>People v. Sargent</u> (1999) 19 Cal.4th 1206, 1215.)

Rape is a general intent crime (<u>People v. Williams</u> (1992) 4 Cal.4th 354, 366-367, fn. 1 (conc. opn. of Mosk, J.); <u>see also People v. Burnham</u> (1986) 176 Cal.App.3d 1134, 1140; <u>People v. Franklin</u> (1976) 56 Cal.App.3d 18, 27), and requires only the perpetrator's criminal intent to commit sexual intercourse "irrespective of or without consent."  (<u>People v. Williams, supra</u>, at p. 366, fn. 1; <u>see People v. Burnham, supra</u>, at p. 1142; <u>Frank v. Superior Court</u> (1989) 48 Cal.3d 632, 642 (conc. opn. of Kaufman, J.).)  "The intent to engage in an act of sexual intercourse that is in fact unconsented and forcible, either purposely, knowingly, or recklessly, does not implicate an 'intent to do some further act or achieve some additional consequence' beyond the 'proscribed act.'  (<u>People v. Williams, supra</u>, at p. 367, fn. 1.)

Thus, in the present case, the jury was properly instructed that rape, pursuant to section 261, subdivision (a)(2), was a general intent crime.  (CALCRIM No. 250.)  The jury was also instructed to consider the issue of consent and the absence or withdrawal thereof, and instructed that a defendant was not guilty of the crime if he had a reasonable belief that the victim consented.  (CALCRIM No. 1000.)  Looking at the instructions given as a whole, no error occurred.

**Lesser Included Offense Instructions**

Appellant contends that the trial court should have instructed on assault and battery as lesser included offenses of rape.  His theory is that, had the jury been so instructed, it might have accepted the proposition that his victims consented to sexual intercourse and merely objected to being menaced with the knife.  We disagree.

In the "context of forcible rape, courts expressly have held that battery is a necessarily included offense [citations]…"  (<u>People v. Hughes</u> (2002) 27 Cal.4th 287, 366, citing <u>People v. Gutierrez</u> (1991) 232 Cal.App.3d 1624, 1636 & fn. 2, disapproved on other grounds in <u>People v. Cromer</u> (2001) 24 Cal.4th 889, 901; <u>People v. Lema</u> (1987) 188 Cal.App.3d 1541, 1545.)  And assault is a lesser included offense of a charge of battery.  (<u>People v. Paul</u> (1978) 78 Cal. App.3d 32, 45.)  Therefore assault and battery are both lesser included offenses of forcible rape.

But the conclusion that both assault and battery are lesser included offenses of forcible rape does not mean instructions on those offenses were required in this case.  "[T]he trial court must instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser."  [Citation.]"  (<u>People v. Lacefield</u> (2007) 157 Cal.App.4th 249, 256.)  "On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support…[¶]…'Substantial evidence' in this context is " 'evidence from which a jury composed of reasonable [persons] could….conclude[ ]'" that the

lesser offense, but not the greater, was committed. [Citations.]" (<u>People v. Breverman</u> (1998) 19 Cal.4th 142, 16.)

With one possible exception discussed below, and notwithstanding the errors appellant asserts, there simply was no evidence to support the proposition that his victims consented to sex after being menaced with the knife. Each of the victims testified to the contrary, as described ante. And in fact, appellant himself admitted (in his confession) that the victims were afraid of him and the knife.

Neither (except for the one possible exception discussed below) did appellant present a defense at trial based on any theory that the victims consented to sex but not to being threatened with the knife. His defense was amorphous to say the least. He presented testimony from two witnesses. An analyst from the Department of Justice (DOJ), who examined appellant's car, testified that he found no significant fingerprints in his examination of the car. Another DOJ analyst testified that she examined and found no blood on the knife, and that she was unsuccessful in trying to match DNA samples from the victims to stains she located in appellant's car.

In closing argument, defense counsel did his best. As to the victim V.B (count 1), counsel told the jury to consider "the lack of corroborating evidence, a lack of physical evidence," and to acquit on that basis. As to J.W. (count 2), counsel argued the events J.W. described did not occur at the time the other evidence indicated the crimes occurred. He also attacked her credibility on the basis of inconsistencies between her testimony and her pretrial statements. The inference to be drawn was that she was not one of the victims named in the charges. As to A.H. (count 3), counsel allowed that she possibly was one of the women of whom appellant spoke of in his confession: "that could very well have been [A.H.], if you believe that [A.H.] was raped." Counsel concluded his argument with an appeal to sympathy, pointing out that appellant had not in fact inflicted any physical injury on any of the victims, had never meant to harm them, and was remorseful.

In all of these circumstances, we are confident that no error occurred in failing to instruct on assault or battery in connection with counts 1 through 3. The situation is slightly different with regard to count 4, relating to C.S. Defense counsel argued with reference to C.S. that the jury should infer, from the facts that she asked appellant to drive her home after the sexual intercourse and that she was back on the street the very next day, that she was not "actually…scared." Otherwise, however, counsel failed to rebut appellant's own confession that C.S. had told him she did not want him to use the knife. We do not view counsel's argument or the evidence from which it stemmed as a sufficient basis "'"from which a jury composed of reasonable [persons] could [have] …concluded'" that the lesser offense, but not the greater, was committed. [Citations.]" (<u>People v. Breverman, supra</u>, 19 Cal.4th at p. 162.)

The suggested lesser included offense instructions were not required.

(Ex. A, pp. 14-19).

        2. <u>Federal Standard</u>.

In general, the issue of whether a jury instruction is a violation of state law is neither a federal question nor a proper subject for habeas corpus relief. <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991). ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "),

1    *quoting* <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990); <u>Gilmore v. Taylor</u>, 508 U.S. 333, 348-49 (1993)

2    (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a

3    constitutional violation, may not be corrected on federal habeas"). Indeed, federal courts are bound by

4    state court rulings on questions of state law. <u>Oxborrow v. Eikenberry</u>, 877 F.2d 1395, 1399 (9th Cir.),

5    *cert. denied*, 493 U.S. 942 (1989). In addition, "the availability of a claim under state law does not of

6    itself establish that a claim was available under the United States Constitution." <u>Sawyer v. Smith</u>, 497

7    U.S. 227, 239 (1990), *quoting,* <u>Dugger v. Adams</u>, 489 U.S. 401, 409 (1989).

8        In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would

9    have understood the instruction as a whole; rather, the court must inquire whether there is a

10   "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the

11   Constitution. <u>See Estelle v. McGuire</u>, 502 U.S. at 72 & n. 4; <u>Boyde v. California</u>, 494 U.S. 370, 380,

12   110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).  However, a determination that there is a reasonable

13   likelihood that the jury has applied the challenged instruction in a way that violates the Constitution

14   establishes only that an error has occurred. <u>See Calderon v. Coleman</u>, 525 U.S. 141, 146, 119 S.Ct.

15   500, 142 L.Ed.2d 521 (1998). If an error is found, the court also must determine that the error had a

16   substantial and injurious effect or influence in determining the jury's verdict before granting habeas

17   relief. See id. at 146–47 (citing <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637, 113 S.Ct. 1710, 123

18   L.Ed.2d 353 (1993)).

19       In determining whether instructional error warrants habeas relief, a habeas court must consider

20   "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction

21   violates due process' ... not merely whether 'the instruction is undesirable, erroneous, or even

22   universally condemned.'"  <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154, 97 S.Ct. 1730 (1977) (*quoting*

23   <u>Cupp v. Naughten</u>, 414 U.S. 141, 146-47, 94 S.Ct. 396 (1973)); <u>California v. Roy</u>, 519 U.S. 2, 5, 117

24   S.Ct. 337, 338 (1996) (challenge in habeas to the trial court's jury instructions is reviewed under the

25   standard in <u>Brecht v. Abrahamson</u>, 507 U.S. at 637--whether the error had a substantial and injurious

26   effect or influence in determining the jury's verdict.).  The burden of demonstrating that an erroneous

27   instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a

28

20

1    state court's judgment is even greater than the showing required to establish plain error on direct

2    appeal. Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).

3         In a criminal case, an evidentiary device must not undermine the fact-finder's responsibility at

4    trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt.

5    County Court of Ulster County, N. Y. v. Allen, 442 U.S. 140, 156, 99 S.Ct. 2213, 2224 (1979); In re

6    Winship, 397 U.S. 358, 364, 90 S.Ct. 1068 (1970).  A permissive inference is one of the most common

7    evidentiary devices, which allows, but does not require, the trier of fact to infer the elemental fact from

8    proof by the prosecutor of the basic one and which places no burden of any kind on the defendant.

9    Ulster, 442 U.S. at 157, 99 S.Ct. at 2224.  "Because this permissive presumption leaves the trier of fact

10   free to credit or reject the inference and does not shift the burden of proof, it affects the application of

11   the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way

12   the trier could make the connection permitted by the inference."  Id., 442 U.S. at 157, 99 S.Ct. at 2225;

13   U.S. v. Warren, 25 F.3d 890, 897 (9th Cir. 1994); Sterling v. Roe, 2002 WL 826807 (N.D. Cal. 2002).

14   "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one

15   that reason and common sense justify in light of the proven facts before the jury."  Francis v. Franklin,

16   471 U.S. 307, 314-315 (1985).

17        The Due Process Clause of the Fourteenth Amendment "protects the accused against

18   conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

19   crime with which he is charged."  In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073 (1970).  The

20   United States Supreme Court has held that "the Constitution does not require that any particular form

21   of words be used in advising the jury of the government's burden of proof.  Rather, taken as a whole,

22   the instructions must correctly convey the concept of reasonable doubt to the jury."  Victor v.

23   Nebraska, 511 U.S. 1, 5, 114 S.Ct. 1239 (1994).  This standard reduces the chance that an innocent

24   person will be conviction.  In re Winship, 397 U.S. at 362.  Winship does not require that every single

25   fact upon which the jury relies be proven to a reasonable doubt.  Many facts not proven to that

26   standard may, collectively, allow the jury to infer that an element of the crime is proven beyond a

27   reasonable doubt.  To enforce Winship's rule, judges must instruct juries that they cannot return a

28

                                         21

guilty verdict unless the government has met this burden.  Cool v. United States, 409 U.S. 275, 278 (1972).  A jury conviction based upon an impermissibly low quantum of proof violates the jury trial guarantee of the Sixth Amendment.  Sullivan v. Louisiana, 508 U.S. 275, 278 (1993).  A judge can violate a defendant's rights by giving an instruction that undercuts the force of an otherwise proper beyond-a-reasonable-doubt instruction.  See, e.g., Cool, 409 U.S. at 102-103; Sandstrom v. Montana, 442 U.S. 510, 521 (1979).

When a jury instruction is susceptible to a reading that would render the verdict unconstitutional and another that would generate a proper verdict, the reviewing court considers the challenged instruction in light of the full jury charge and in the context of the entire trial.  See Naughten, 414 U.S. at 145-147(consider charge as whole); United States v. Park, 421 U.S. 658, 675 (1975)(consider context of whole trial).  The court must then decide whether there is a reasonable likelihood that the jury applied the challenged instruction in an unconstitutional manner.  Estelle, 502 U.S. at 72.  A verdict remains valid if a jury instruction only tangentially undercut a proper beyond-a-reasonable-doubt instruction.  Naughten, 414 U.S. at 149-150.

Regarding a lesser included offense instruction, the United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction.  Beck v. Alabama, 447 U.S. 625, 638 (1980).  In a non-capital case, such as the case at bar, a defendant is "entitled to an instruction on a lesser included offense if the evidence would permit a jury to rationally find him guilty of a lesser offense and acquit him of the greater."  Keeble v. United States, 412 U.S. 205, 208 (1973).  However, in a noncapital case, the failure of a trial court to instruct sua sponte on lesser included offenses does not present a federal constitutional question. Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998); Turner v. Marshall, 63 F.3d 807, 813 (9th Cir.1995), *overruled on other grounds* by Tolbert v Page, 182 F.3d 677 (9th Cir.1999) (*en banc*) (finding the application of Beck to noncapital cases barred by Teague v. Lane, 498 U.S. 288, 299-300, 109 S.Ct. 1060, 1069 (1989)); James v. Reese, 546 F.2d 325, 327 (9th Cir.1976) (*per curiam*).  However, a defendant may suffer a due process violation if the court's failure to give a requested instruction prevents a defendant from presenting his theory of the case.  Bashor v.

Risley, 730 F.2d 1228, 1240 (9th Cir. 1984), *cert. denied*, 469 U.S. 838 (1984); <u>see</u>, <u>also</u>, <u>United States v. Mason</u>, 902 F.2d 1434, 438 (9th Cir.1990) ("A defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence.").

In <u>Bashor v. Risley</u>,  730 F.2d 1228, 1240 (9th Cir. 1984), *cert. denied*, 469 U.S. 838 (1984), the Ninth Circuit recognized that a court's failure to give a lesser included instruction did not present a federal constitutional claim.  <u>Bashor</u>, 730 F.2d at 1239.  Nevertheless, the Court found "no fundamental unfairness in the trial court's failure to instruct on a lesser included offense" to a homicide charge as counsel did not request the lesser included offense instruction and the defense strategy was based "on the theory that <u>Bashor</u> was either guilty or not guilty of deliberate homicide." <u>Id.</u>; <u>see Solis v. Garcia</u>, 219 F.3d 922, 929 (9th Cir. 2000); <u>James v. Reese</u>, 546 F.2d 325, 327 (9th Cir. 1976)("Failure of a state court to instruct on a lesser included offense fails to present a federal constitutional questions and will not be considered in a federal habeas corpus proceeding.").

3.  <u>Analysis.</u>

As to CALCRIM 1000, Respondent is correct that the claim is barred.  As the 5th DCA noted in its opinion, Petitioner "forfeited his right to appellate review by failing to make a request that the trial court modify the instruction" at trial.

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  <u>Coleman v. Thompson</u>, 501 U.S. 722, 729, 111 S.Ct. 2546 (1991); <u>LaCrosse v. Kernan</u>, 244 F.3d 702, 704 (9th Cir. 2001); <u>see Ylst v. Nunnemaker</u>, 501 U.S. 797, 801 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1150 (2000) ("A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements . . . ."); <u>see also Fox Film Corp. v. Muller</u>, 296 U.S. 207, 210 (1935).  If the court finds an independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice."  <u>Noltie v. Peterson</u>, 9 F.3d 802, 804-805

1   (9th Cir. 1993); Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

2           California law requires that, with certain exceptions, appellate courts will not consider claims

3   of error that could have been, but were not, raised via timely objection in the trial court.  People v.

4   Vera, 15 Cal.4th 269, 275 (1997).  That rule has been deemed both independent of federal law, People

5   v. Williams, 16 Cal.4th 153, 208 (1997), and consistently applied.  Melendez v. Pliler, 288 F.3d 1120,

6   1125 (9th Cir. 2002).  Accordingly, the state court's conclusion that the claim was procedurally

7   defaulted in appeal will not be disturbed upon collateral review.

8           Moreover, regarding the merits of Petitioner's claim that CALCRIM No. 1000 was defective,

9   the 5th DCA disagreed, noting that under California law a victim could withdraw her consent at any

10  time, that the instruction did not alter that statement of the law, and that there was no evidence that any

11  of the victims failed to withdraw their consent upon being threatened with the knife.  Accordingly, this

12  Court is bound by the state court's interpretation of its own laws.  Oxborrow, 877 F.2d at 1399.

13          As to CALCRIM No. 250, the 5th DCA made quick work of Petitioner's claim by reaffirming

14  that, under California law, rape is a general intent crime, not a specific intent crime.  Since CALCRIM

15  No. 250 correctly instructed the jury on the general intent crime of forcible rape, Petitioner's claim

16  fails under state law.  Again, this Court is bound by the state court's interpretation of its own laws.

17  Oxborrow, 877 F.2d at 1399

18          Finally, regarding the lesser included offense instruction, although the Ninth Circuit's decision

19  in Bashor might, under the appropriate circumstances, appear to give rise to a claim of fundamental

20  unfairness in a state court's refusal to give a lesser included offense instruction, the United States

21  Supreme Court has not addressed the issue.  Thus, there is no "clearly established" federal law as

22  determined by the Supreme Court, and, hence, there can be no cognizable federal habeas claim for

23  failure to give such an instruction in a state criminal proceeding.  See 28 U.S.C. § 2254(d).

24          On the merits of Petitioner's claim regarding the lesser included offense of assault and battery,

25  the state court noted that no evidence was presented that any of the victims consented to the sexual

26  assault and there was no evidence they consented to assault and battery via the knife.  Therefore,

27  evidence was lacking to support the giving of a lesser included offense instruction for assault and

28

24

battery. This determination is objectively reasonable.  Under California law as determined by the California Supreme Court, the lesser included offense instructions would only be required if reasonable jurors could have concluded that the assault and battery using the knife had been committed but not the rape.  People v. Breverman, 19 Cal.4[th] at 162.  For the reasons set forth by the 5th DCA, the Court agrees that no reasonable jurors would have reached such a conclusion.  Hence, the lesser included offense instructions were not required under state law and this Court is in no position to contradict the state court's interpretation of its own laws.

Additionally, any error was harmless.  The evidence of Petitioner's guilt as to the four forcible rape charges was overwhelming.  It is apparent that the instructions as a whole adequately instructed the jury regarding the burden of proof, the elements of each of the offenses, Petitioner's theory of the case and defenses, and the relation of that defense and theory to the reasonable doubt instruction. The jury is presumed to have followed those instructions. Weeks v. Angelone, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000).  Under those circumstances, even if error occurred in applying state law, it was harmless.  Brecht v. Abrahamson, 507 U.S. at 637.  Accordingly, the state court decision was not contrary to nor an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d).  Hence, the claim should be denied.

C.  Admission Of A Prior Uncharged Act

Next, Petitioner claims that the trial court erred in permitting the introduction of evidence that Petitioner committed a prior uncharged crime.  This contention too is without merit.

1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

Appellant asserts that the trial court erred by admitting evidence of his uncharged act of "window peeking" pursuant to Evidence Code sections1108 and 352.  Respondent agrees that the evidence was inadmissible under Evidence Code section 1108, but submits that any error was waived by failing to object to it at trial, and that, in any event, any error was harmless. While we find that the record shows appellant filed a motion in limine objecting to the testimony of S.M. pursuant to Evidence Code section 352, we otherwise agree with respondent.  Though the evidence was inadmissible, no prejudicial error occurred.

Evidence that a person has a propensity or disposition to commit criminal acts is generally inadmissible, and is excluded because of its highly prejudicial nature.  (Evid. Code § 1101; People v. Karis (1988) 46 Cal.3d 612, 636.)  The admissibility of character evidence was previously limited to establish some fact other than a person's character of disposition, such as

motive, intent, identity, or common scheme and plan.  (Evid. Code, § 1101, subd. (b); People v. Karis, supra, at p. 636; People v. Soto (1998) 64 Cal.App.4th 966, 983.)

Evidence Code section 1108 provides an exception to Evidence Code section 1101 and permits the jury in sex offense cases to consider evidence of prior charged or uncharged sex offenses for any relevant purpose.  (People v. Falsetta (1999) 21 Cal.4th 903, 911-912; People v. James (2000) 81 Cal.App.4th 1343, 1353, fn. 7.)  Evidence Code section 1108, subdivision (a) states: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

Evidence Code section 1108 therefore permits the trier of fact to consider a defendant's prior uncharged sex offenses as propensity evidence.  (People v. Falsetta, supra, 21 Cal.4th at p. 911; People v. Pierce (2002) 104 Cal.App.4th 893, 897.)  But, as noted by both appellant and respondent, a violation of section 647, subdivision (i), "window peeking," does not fall within the definition of a "sexual offense" as defined in Evidence Code section 1108, subdivision (d), and the evidence should not have been admitted.

Nevertheless, any error on the court's part regarding the uncharged "window peeking" offense was harmless under any standard.  (Chapman v. California, supra, 386 U.S. at p. 24; People v. Watson, supra, 46 Cal.2d at p. 836.)  The evidence of appellant's guilt was overwhelming.  We see no reasonable possibility that the erroneously admitted evidence in any way contributed to the verdicts.

(Ex. A, pp. 19-20).

### 2. Federal Standard.

A federal habeas corpus court has no authority to review a state's application of its own laws, but rather must determine whether a prisoner's constitutional or other federal rights have been violated. Estelle v. McGuire, 502 U.S. at 67-68; Jackson v. Ylst, 921 F.2d at 885.  Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. Estelle, 502 U.S. at 67; Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), cert. denied, 478 U.S. 1021 (1985).  Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 502 U.S. at 72; Pulley v. Harris, 465 U.S. 37, 41 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), cert. denied, 510 U.S. 1191 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process

26

violation.  Id. at 920.  Intent is a permissible inference that the jury may draw from the evidence of prior bad acts.  See, Houston v. Roe, 177 F.3d 901, 910 n. 6 (9th Cir. 1999).

Under California law, uncharged misconduct is admissible if the conduct is sufficiently similar to the charged offense to support the inference that the defendant probably harbored the same intent in each instance.  People v. Ewoldt, 867 P.2d 757, 7 Cal.4th 380, 402 (1994).  The Ninth Circuit has upheld the admission of prior crimes or bad acts where (1) there is sufficient proof that defendant committed the prior act; (2) the prior act is not too remote in time, (3) the prior act is similar (if admitted to show intent); (4) the prior act is used to prove a material element; and (5) the probative value is not substantially outweighed by prejudice.  See Walters v. Maas, 45 F.3d at 1357-58 (upholding state admission of prior on federal habeas review); see, also, United States v. Sneezer, 983 F.2d 920, 924 (9th Cir. 1992), cert. denied, 114 S.Ct. 113 (1993).

3.  Analysis.

As Respondent correctly contends, the United States Supreme Court has made very few pronouncements on the admission of evidence as a violation of due process and there is no "clearly established" federal law regarding such errors.  Thus, habeas relief is not available under the AEDPA.  28 U.S.C. § 2254(d).

Addressing the merits, however, the state court concluded that admission of the prior "window peeking" charge was error because it was not sufficiently similar to the charged rape incidents to qualify for admission as a prior similar act under state law.  Nevertheless, the state court found the error harmless.  Federal courts apply only one harmless error standard, i.e., Brecht v. Abrahamson, 507 U.S. 619, 623 (1993), which holds that, to justify habeas relief, an error must have had a "substantial and injurious" effect on the jury's verdict.  See also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  In the Court's view, the error here did not have such an effect.

As the 5th DCA noted, the evidence that Petitioner was guilty of the four forcible rapes was overwhelming.  Indeed, Petitioner did not deny any of the particular facts of the rapes, only the legal significance of those facts, i.e., whether the victims' conduct can be considered a withdrawal of

27

consent under California law.  Given the Court's resolution of the consent issue, the evidence is

otherwise overwhelming that Petitioner committed four rapes.  Under such circumstances, the

admission of a prior "window peeking" episode can hardly be considered to have had a "substantial

and injurious" effect on the jurors' verdict. Indeed, as the 5th DCA pointed out, it did not bear upon the

fact of guilt at all.  Thus, the only effect could have been to engender some generalized residual

prejudice against Petitioner.  However, as mentioned, given the state of the evidence and the

overwhelming evidence of Petitioner's guilt as to all four victims, any prejudice from the "window

peeking" episode would have been de minimis.  Accordingly, the state court's adjudication was neither

contrary to nor an unreasonable application of clearly established federal law.

    D.  Ineffective Assistance of Counsel

Finally, Petitioner claims that trial counsel was ineffective pursuant to Petitioner's rights under

the Sixth Amendment.  This contention too is without merit.

    1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

Finally, appellant contends he was denied the effective assistance of counsel for the following reasons: "(1) counsel failed to request modification of CALCRIM No. 1000 so that the rules governing withdrawal of consent would clearly apply to a penetration withdrawal of consent, (2) counsel allowed the prosecutor to misrepresent the law in summation by arguing that the rules governing withdrawal of consent applied only to a post-penetration withdrawal of consent, (3) counsel requested CALCRIM No. 250, which eliminated the People's burden of proving a union or joint operation of act and mental state and allowed the prosecutor to exploit the error in summation, (4) counsel failed to argue that window peeking is not a 'sexual offense' within the meaning of Evidence Code section 1008 and failed to object to CALCRIM No. 2916, and (5) counsel requested CALCRIM No. 1191 which included an irrational permissible inference."

A defendant has the burden of proving ineffective assistance of counsel.  (People v. Babbitt (1988) 45 Cal.3d 660, 707.)  To establish a valid claim, a defendant must show "'…that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citation.]'" (People v. Riel (2000) 22 Cal. 4th 1153, 1175.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Strickland v. Washington (1984) 466 U.S. 668, 694.)

Because we have addressed each of appellant's contentions on the merits in the body of the opinion and have found either no error or no prejudicial error, his claim of ineffective assistance of counsel fails.

28

(Ex. A, pp. 23-24).

> 2. Federal Standard.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the two-pronged test set forth in Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the appeal. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance.  Knowles v. Mirzayance, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles v. Mirzayance, 556 U.S. ___, 129 S.Ct. at 1420.  In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable.  Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state

1   court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

2   See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was

3   unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway

4   courts have in reaching outcomes in case-by-case determinations").

5          Here, the state court identified the appropriate federal standard by applying Strickland.  Thus,

6   the only issue is whether the state court's adjudication, i.e., that defense counsel's representation was

7   neither deficient nor prejudicial, was not contrary to or an unreasonable application of Strickland.  For

8   the reasons discussed below, the Court concludes that it was not.

9                  3.  Analysis.

10         Because Petitioner's various substantive claims were rejected by the state court and have been

11  found by this Court either to lack merit or to have been harmless errors, Petitioner cannot meet both

12  prongs of the Strickland test.  No sophisticated reasoning is required to conclude that Strickland has

13  not been met under those circumstances:  no finding of ineffective assistance can be based upon an

14  attorney's performance that is either not deficient or not prejudicial.  Accordingly, this claim should be

15  rejected.

16                          **RECOMMENDATION**

17         Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus

18  (Doc. 1), be DENIED with prejudice.

19         This Findings and Recommendation is submitted to the United States District Court Judge

20  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

21  Rules of Practice for the United States District Court, Eastern District of California.  Within twenty-

22  one (21) days after being served with a copy of this Findings and Recommendation, any party may file

23  written objections with the Court and serve a copy on all parties.  Such a document should be

24  captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the

25  Objections shall be served and filed within ten (10) court days (plus three days if served by mail) after

26  service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28

27  U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

28

30

1  may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

2  Cir. 1991).

3

4  IT IS SO ORDERED.

5      Dated:   **March 3, 2014**                              **/s/ Jennifer L. Thurston**

6                                                      UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28